[Cite as *State v. Deeter*, 2011-Ohio-6107.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                      :

      Plaintiff-Appellee           :          C.A. CASE NO.   24428

v.                             :          T.C. NO.   10CR2963

CHRISTOPHER DEETER        :        (Criminal appeal from
                                       Common Pleas Court)

      Defendant-Appellant     :

                                 :

· · · · · · · · · ·

## **O P I N I O N**

Rendered on the   23rd   day of   November  , 2011.

· · · · · · · · · ·

JOHNNA M. SHIA, Atty. Reg. No. 0067685, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

THOMAS J. MANNING, Atty. Reg. No. 0059759, P. O. Box 751484, Dayton, Ohio 45475
      Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Christopher Deeter, filed January 13, 2011. On September 24, 2010, Deeter was indicted on one count of gross sexual imposition, in violation of R.C. 2907.05(A)(1), (force or threat of force), a felony of the fourth degree.

The victim is Deeter's niece, C.D., who was 14 years old at the time of the incident, which occurred between September 3 - 6, 2010. Christopher pled not guilty, and a jury found him guilty following a trial that commenced on November 18, 2010. On January 3, 2011, the trial court sentenced Christopher to a term of 18 months and designated him a Tier 1 sex offender.

{¶ 2} At trial, Tonya Johnson testified that she has been C.D.'s foster mother since November, 2009. At the time of the incident, C.D. resided in her home, in Springfield, during the week, and she had weekend visitations with her father, Russell Deeter. Russell resided with his brothers, Christopher and Jessie Deeter, and his mother, Beverly Deeter. Tonya stated that her home is a behavioral treatment foster home. She testified that C.D.'s placement in her home was a voluntary one by C.D.'s father. Tonya stated that C.D. has been diagnosed with ADHD and bipolar disorder, and that she takes Celexa, Abilify and Concerta. Tonya stated that when C.D. first came to live with her, she "was different from some of the other foster kids that came into my home. She didn't communicate very well, not really at all. She shut down a lot. Hardly any verbal communication.

{¶ 3} "She never gave me eye contact. I'd ask her what her favorite food was, she wouldn't answer that. And kind of defiant." Tonya stated that since C.D. has been in her home, she and C.D. worked "very hard" on these issues, and Tonya testified that she observed improvement in C.D's demeanor.

{¶ 4} According to Tonya, when C.D. first came to live in her home, C.D. also exhibited poor hygiene. Tonya stated that C.D. had body odor, did not want to shower, and lied about showering. Tonya stated that she worked on the issue with C.D., and "for a while it seemed to get better except for when she went on home visits."

{¶ 5} The following exchange occurred regarding C.D.'s hygiene:

**{¶ 6}** "Q.  I want to talk about the time frame of early September of 2010.  Around that time did you start to notice some unusual changes in [C.D.'s] behavior or her demeanor?

**{¶ 7}** "A.  Yes.

**{¶ 8}** "Q.  And tell the jurors what you noticed.

**{¶ 9}** "A.  Her hygiene was at the worst, becoming each week worse and worse back to kind of when she first came in.  It was - - it was just - - I mean, as soon as she came home, she would have to shower.  Right away.

**{¶ 10}** "Q.  And when you say came home, came home from where?

**{¶ 11}** "A.  From her home visit, from being with her dad.

**{¶ 12}** "Q. * * * And was she doing anything else in addition to personal hygiene?

**{¶ 13}** "A.  Yes.  She - - we started having an issue with her underwear.  She was leaving underwear, dirty underwear and bloody underwear, she'd put them back in her drawer.  She'd put them on her bed; she'd put them on other foster child's dressers right in plain view on top of the dresser.

**{¶ 14}** "* * *

**{¶ 15}** "Q.  Did she ever leave anything in her bag when she came from the weekend?

**{¶ 16}** "A.  Yes.  When she arrived back on September the 12th, when I opened the bag to check it, there was a dirty pair of underwear with blood in them right square on top of the bag. And she knew I would be opening the bag.

**{¶ 17}** "Q.  And regarding the dirty or bloody underwear that you described for us, is that a behavior that she had exhibited in the past when she lived with you, or is this something new?

**{¶ 18}** "A.  She'd maybe done it once or twice, hidden underwear.  But it had really

increased. It really kind of became new at that point, in the last thirty days. From September 12th forward.

{¶ 19} "* * *

{¶ 20} "Q. * * * And what were your concerns, what did you think?

{¶ 21} "A. I just knew that she was wanting to kind of tell us that something's wrong, something's not right. She was kind of showing me, you know. She knew I was going to see the underwear, so that was a red flag to me.

{¶ 22} "The hygiene, she knew we had several meetings about that, several talks about what she needed to do right.

{¶ 23} "She also layered her clothes a lot. Even in the summer sometimes, she would layer her shirts and layer clothing.

{¶ 24} "There's - - her behavior as well was more defiant. Seemed like she was going backwards."

{¶ 25} Tonya testified that, based upon her concerns, she spoke to C.D. on September 12, 2010, and she described C.D.'s demeanor at the time as very "upset; very depressed. Starting to withdraw. Crying. Very emotional." Tonya stated that since the time of her conversation with C.D., C.D.'s visits with her father have been suspended, and that C.D. has had no further problems with her hygiene and dirty underwear.

{¶ 26} When asked if C.D. lacked truthfulness, Tonya replied, "She lies like any other normal kid."

{¶ 27} On cross-examination, Tonya stated that C.D. sometimes lies to avoid consequences, but she has never known her to lie to "get her own way." Tonya stated that she

saw C.D. on Friday, September 3, 2010, for the last time before her visitation, "[d]uring the drop off," and that she next saw her on the following Monday evening.

{¶ 28} C.D. testified that before she lived in the foster home with Tonya and her husband, she lived with her father, his two brothers, and her grandmother, in a three bedroom home. She stated that when she visits her father, she stays in one room, her grandmother stays in one room, and her Uncle Jessie stays in one room, while her father and Christopher sleep on separate couches. C.D. stated that Christopher kept his clothes in a box in the room where she slept.

{¶ 29} C.D. stated that on Labor Day weekend, beginning Friday, September 3, 2010, she was scheduled to have a regular weekend visit at her father's home at 2427 Kildare Avenue. C.D. stated that her father picked her up for visitation, and they went to his house. Later, C.D. went to her mother's home, and she and her mother went to the fair. She testified that she spent Friday night at her mother's home. C.D. stated that her father came to pick her up on Saturday, and she went back to his home because she and her mother got into an argument. C.D. stated that she spent Saturday and Sunday night at her father's house.

{¶ 30} One of those nights, C.D. stated that she put her pajamas on and went to bed with the bedroom door closed but unlocked. She was awakened later by Christopher, who had entered the room and was "getting in his clothes box." C.D. testified that she remained still under the covers and that Christopher "stood there," and then he came close to C.D.'s bed. According to C.D., Christopher laid down on top of the covers. C.D. stated that she was scared and did not move. C.D. testified that Christopher placed his hand under the covers and under her pajama bottoms, and he touched her "private." The prosecutor showed C.D. a drawing of a girl, and C.D. circled the area that Christopher touched with his hand, and she initialed the

drawing. C.D. stated that Christopher made her feel "bad," and she did not push his hand away or try to stop him because she was scared that he would hurt her. C.D. stated that Christopher told her not to tell anyone, and that he would hurt Tonya if she did. According to C.D., Christopher then returned to the living room, and she fell back asleep. She stated that no one else in the house was awake at the time. C.D. stated that she did not tell anyone in the house what happened the next day, and Christopher did not mention it.

{¶ 31} C.D. testified that she waited a little bit and then told Tonya the next weekend what had happened. She stated that she has not had visits with her father since she revealed the incident to Tonya. She stated that she misses her father, her Uncle Jessie and her grandmother, but she is scared to go back to their home if Christopher is there.

{¶ 32} Detective Paul Henson, of the Montgomery County Sheriff's Office, testified his basic duties are to conduct forensic interviews related to crimes against children. He testified that forensic interviews are conducted by means of open-ended, yes/no questions to avoid putting ideas into the mind of a child victim. Henson met with C.D at Care House, a child advocacy center. Henson stated that he did not conduct the forensic interview of C.D., but he observed that C.D cooperated with the process. Based upon his investigation and the interview, charges were filed against Christopher.

{¶ 33} Dr. Lori Vavul-Roediger testified that she is employed by Dayton Children's Medical Center as a pediatrician specializing in child abuse pediatrics. She stated that she examined C.D. on September 20, 2010. Vavul-Roediger stated that at the time, C.D was "withdrawn, very anxious appearing, had difficulty maintaining * * * routine eye contact with me. She was very cooperative, very pleasant, very willing to engage in conversation with me.

{¶ 34} "But nonetheless it was very readily apparent to me that she was quite fearful and anxious, especially with regard to conversation that focused or hinted at the primary reason that she was presenting for evaluation." Vavul-Roediger stated that C.D. told her that she felt safe in her foster home, and that she did not feel safe at her father's home. She told Vavul-Roediger that "'Chrissie told me that he would kill Tonya, my foster mom, if I told her what he did to me and she told.'" When asked what Chrissie did to her, C.D. responded, "'he hurt me.'" Vavul-Roediger testified that she conducted a complete physical examination of C.D., and she did not observe any genital injury. She stated that based upon what C.D. had disclosed, namely fondling without penetration, "the finding of a normal exam would not be of a surprise to me." Vavul-Roedier diagnosed C.D. with "suspected emotional maltreatment and suspected sexual maltreatment."

{¶ 35} At the close of the State's case, Christopher moved for acquittal, arguing that the State failed to demonstrate that Christopher had the intent to either sexually arouse or gratify. The court overruled the motion for acquittal.

{¶ 36} Christopher's mother, Beverly, testified that she lived with her three sons at the time of the incident. When asked if she got along with C.D., she replied, "well, I thought I was 'cause we was talking a lot, but not any more." When asked if she ever spoke to anyone about C.D.'s truthfulness, she replied, "My neighbors and they didn't trust her and I didn't either." Beverly testified that C.D. is untruthful. Beverly stated that she did not see C.D. on September 3, 2010 - September 6, 2010. She stated that Christopher was not at her residence on September 4, 2010.

{¶ 37} On cross-examination, Beverly testified that she has emphysema and is on oxygen.

Due to her condition, Beverly stated that she sleeps a lot. Beverly stated that C.D. had scheduled visits with Russell, but sometimes "she'll ask if she can go and stay with her mom." Beverly again stated that she was certain that C.D. was not at her home over the Labor Day weekend at issue. She stated that Christopher was there "off and on 'cause he was workin'" at the drive-through. The following exchange occurred:

{¶ 38} "Q. * * * Is it your memory that he worked a lot that weekend?

{¶ 39} "A. Oh, yeah.

{¶ 40} "Q. * * * So would it surprise you to know that he only worked about four hours that weekend?

{¶ 41} "A. Couldn't tell you because I don't see his stubs. And I don't ask.

{¶ 42} "Q. Oh, but you were home that whole weekend?

{¶ 43} "A. Well, yes.

{¶ 44} "Q. * * * And you're able to tell us that [C.D.] wasn't there; right?

{¶ 45} "A. Well, I know she wasn't there.

{¶ 46} "Q. * * *Tell us where Chrissie was on Saturday, September 4th. Do you remember?

{¶ 47} "A. Well, he was at work.

{¶ 48} "* * *

{¶ 49} "Q. * * * Well, can you tell me what time he was in your house on September 4th and what time he was gone?

{¶ 50} "A. He was late when - - I got up in the morning and he was done gone.

{¶ 51} "* * *

{¶ 52} "A.   I usually get up about 9:30, 10:00.

{¶ 53} "Q. * * * So, would you be surprised to know that Chrissie's lawyer gave us a list of his work hours and on Saturday he worked from 5:25 in the morning to 6:00 in the morning?

{¶ 54} "A.   I couldn't tell you because I don't know what his hours are.

{¶ 55} "Q. * * * But it's your memory that he worked a lot.

{¶ 56} "A.   Yes.

{¶ 57} "Q. * * * So then did you know that he worked again on Saturday from one o'clock to 2:45 in the afternoon.

{¶ 58} "A.   No, because I wasn't paying any attention to where he was at.

{¶ 59} "Q. * * * And how about on Sunday, September 5[th], was Chrissie working a lot that day, too?

{¶ 60} "A.   Yes.

{¶ 61} "Q. * * * So would it surprise you to know he only worked from 10:00 in the morning 'till 12:15 in the afternoon?

{¶ 62} "A.   I guess, I - - he don't come straight home.  He goes to his neighbors and helps out with her.

{¶ 63} "Q.   Is that what he did on September 5[th]?

{¶ 64} "A.   (Nodding affirmatively)."

{¶ 65} According to Beverly, C.D. was not at her home on the following weekends in 2010:   September 11-12, September 4-5, August 21 -22, August 14-15, August 7-8, and Beverly stated that she "ain't seen her" in July.   When asked if the last time she saw C.D. was probably in June of 2010, Beverly responded, "I see her off and on, but I don't talk to her."   Beverly stated

that Russell was at her home Labor Day weekend.

**{¶ 66}** Jessie testified that he lived at 2427 Kildare with his brothers and mother on September 3-6, 2010. Jessie testified that he was at the home "all day" and did not see C.D. there. According to Jessie, C.D. has a reputation for untruthfulness. He stated that he is a concession worker and bartender at Hara Arena, and that he works "as there are activities."

**{¶ 67}** On cross-examination, Jessie testified that he spent all of the weekend at issue in his room watching TV. He testified that Christopher worked at the drive-through "most of the weekend." When asked if he would be surprised to learn that Christopher only worked two and a half hours on September 4, 2010, he replied, "probably." Regarding Sunday of that weekend, Jessie testified that Christopher was at the drive-through "most of the afternoon." When asked if he would be surprised to learn that Christopher only worked on Sunday from 10:00 a.m until 12:15 p.m., Jessie responded, "[p]robably. But I stay in my room and watch TV." According to Jessie, Russell was "mainly with" Christopher over the weekend. Jessie denied that C.D. was at the Kildare address on the weekends of September 11-12, and September 18-19, 2010. Jessie stated that on Labor Day weekend, Russell picked up C.D. and "went straight to her mom's house and dropped her off and came back home."

**{¶ 68}** Finally, Christopher testified. The following exchange occurred regarding the weekend at issue:

**{¶ 69}** "Q. * * * Did you ever see [C.D.] any time * * * from September 3 through the 6th?

**{¶ 70}** "A. No.

**{¶ 71}** "Q. * * * And where were you that weekend?

{¶ 72} "A. I was working at the drive-through.

{¶ 73} "Q. How much time did you work at that drive-through?

{¶ 74} "A. Friday, I worked from early in the morning 'til at night. And then Saturday I worked two different times. And then Sunday I worked a little bit.

{¶ 75} "Q. Were you away from the home other than while you were working?

{¶ 76} "A. Yeah.

{¶ 77} "Q. What were you doing?

{¶ 78} "A. Helping the people down the street.

{¶ 79} "Q. So, how - - how much of that weekend would you say that you spent at the home?

{¶ 80} "A. Not that much.

{¶ 81} "* * *

{¶ 82} "A. I'm a workaholic. I can't stay in one place.

{¶ 83} "Q. * * * Do you have any reason to believe that [C.D.] was at the home that weekend?

{¶ 84} "A. I don't know, I'm hardly any home (sic). There. I don't know. I know she was to come down on Fridays. When I got home Friday she wasn't there."

{¶ 85} Christopher stated that he was scared when law enforcement interviewed him about the incident C.D. alleged, and he testified that did not answer questions accurately in the interview. He testified that he never touched C.D.

{¶ 86} On cross-examination, Christopher stated that Henson interviewed him at home. The following exchange occurred:

{¶ 87} "Q. * * * So, when Detective Henson interviewed you and you told him that [C.D.] was at your home on Labor Day weekend, was that the truth or a lie?

{¶ 88} "A. A lie. 'Cause I didn't see her at all."

{¶ 89} Christohper testified that he forgot to tell his attorney that he went to his neighbor's home to help her on Sunday.

{¶ 90} Christopher then denied telling Henson that C.D. was at the Kildare address over the weekend at issue, and Christopher also testified that C.D. did not come to the Kildare address on the weekend after Labor Day.

{¶ 91} After Christopher testified, Deeter renewed his motion for acquittal, and the trial court again overruled it.

{¶ 92} The State then called Henson on rebuttal. Henson stated that he interviewed Christopher on September 17, 2010. Henson testified that prior to speaking with Christopher, he advised him of his *Miranda* rights, and that Christopher agreed to speak with him. The following exchange occurred:

{¶ 93} "Q. * * * And when you interviewed him regarding the allegations that [C.D.]made, did you ask him specifically about the events of Labor Day weekend?

{¶ 94} "A. Yes, I did.

{¶ 95} "Q. And what did you ask him about in terms of whereabouts (sic) on Labor Day weekend?

{¶ 96} "A. Asked him if he remembered [C.D.] being at the residence over Labor Day weekend. He stated he did. However, he worked a lot that weekend and didn't see her much.

{¶ 97} "Q. Now, at the time that you interviewed Mr. Deeter, did he appear confused by

your questions?

**{¶ 98}** "A.   No."

**{¶ 99}** Finally, Henson stated that Christopher was upset that he was detained but that his demeanor was normal.

**{¶ 100}** Christopher asserts one assignment of error herein as follows:

**{¶ 101}** "THE JURY'S VERDICT SHOULD BE OVERTURNED AS A RESULT OF THE INEFFECTIVE ASSISTANCE OF APPELLANT'S TRIAL COUNSEL, WHICH MATERIALLY PREJUDICED HIM."

**{¶ 102}** "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * * .   Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.   *Strickland*, 466 U.S. at 688.   To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different.   *Id.*   Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, Montgomery App. No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 103}** According to Christopher, "the crux of Appellant's defense was that Appellant

and [C.D.] were not together at the place, date and time on which the alleged sexual contact occurred, and therefore the crime did not take place. To the contrary, [C.D.] was with her biological mother, Barbara Deeter, during labor Day weekend of 2010. Nevertheless, trial counsel made no effort to have Barbara Deeter testify, either voluntarily or under subpoena. Nor was any effort made to procure cell phone records that Appellant claims would help prove this and ultimately exonerate him. Appellant submits to this Court that his trial counsel erred accordingly, and that such errors constituted ineffective assistance of counsel, warranting a reversal of his conviction."

{¶ 104} "An attorney's failure to subpoena witnesses is within the realm of trial tactics and does not, absent a showing of prejudice, deny a defendant effective assistance of counsel. *State v. Hunt* (1984), 20 Ohio App.3d 310 * * *." *State v. Woullard* (2004), 158 Ohio App.3d 31, ¶ 65. Accordingly, Deeter must overcome the presumption that, under the circumstances, counsel rendered adequate assistance and the challenged action is sound trial strategy.

{¶ 105} Christopher directs our attention to the following exchange on cross-examination of Henson on rebuttal:

{¶ 106} "Q. Did you interview the biological mother, Barbara Deeter?

{¶ 107} "A. Yes.

{¶ 108} "Q. Did she give you any indication that - -

{¶ 109} "MS. HUBER: Objection

{¶ 110} "BY MR. KING:

{¶ 111} "Q. - - [C.D.] was at her place on - -

{¶ 112} "MS. HUBER: Objection.

{¶ 113} "BY MR. KING:

{¶ 114} "Q.   - - September the 3rd?

{¶ 115} "THE COURT: Sustained.

{¶ 116} "CROSS EXAMINATION CONTINUED

{¶ 117} "BY MR. KING:

{¶ 118} "Q.   But you did interview Barbara Deeter regarding the same report that - - that we're talking about - - you in - - made the indication about Christopher Deeter's statement to you?

{¶ 119} "A.   Correct

{¶ 120} "Q.   Okay.   And in that report - -

{¶ 121} "MS. HUBER: Objection.

{¶ 122} "CROSS EXAMINATION CONTINUED

{¶ 123} "BY MR. KING:

{¶ 124} "Q.   - - did you address the whereabouts of [C.D.]?

{¶ 125} "MS. HUBER: Objection.

{¶ 126} "THE COURT: Approach.

{¶ 127} "(Sidebar conference held as follows:)

{¶ 128} "THE COURT: The report speaks for itself.   You want to admit the report or - -

{¶ 129} "MS. HUBER: No, I think the report - - the report is ripe for hearsay.   He's trying to get the mother's statements in through the detective.

{¶ 130} "MR. KING: Yeah.

{¶ 131} "MS. HUBER: I mean, by changing the words from saying did she tell you to is it

in your report - -

{¶ 132} "THE COURT: Yeah.

{¶ 133} "MS. HUBER:    - - doesn't change the substance of what's happening.   And it's improper introduction of hearsay.

{¶ 134} "MR. KING: Well, Your Honor, basically I'm trying to get at is you wrote the statement on November 17th.   And in that statement, it also included other matters that go towards the truth (indiscernible - someone coughing) of the statement that they're trying to have it - - they're trying - - basically trying to say Mr. Deeter told them * * *   that he saw her at the house.   But at the same   - -

{¶ 135} "* * *

{¶ 136} "MR. KING: - - time he - - at the same time though he had knowledge that she wasn't at the house.

{¶ 137} "THE COURT: Well, she testified to that.

{¶ 138} "MS. HUBER: And that was (indiscernible) - -

{¶ 139} "THE COURT:   - - her mother's house - -

{¶ 140} " * * *

{¶ 141} "THE COURT:   - - on Friday and Friday night and back to her dad's on Sunday, so I   - - we're not going to get into the other witnesses' statements that are in the report."

{¶ 142} The court sustained the State's objection.

{¶ 143} While Christopher asserts that Barbara would have testified that C.D. was not present at the Kildare address during the relevant time period, thereby undermining the State's evidence, and strengthening the evidence presented by the defense, beyond Christopher's

speculation, there is no evidence in the record as to what Barbara's testimony would have been regarding C.D.'s whereabouts on the date(s) at issue. Furthermore, there is nothing in the record as to how the phone records would have assisted Deeter. Accordingly, it is impossible for us to determine if counsel for Christopher provided deficient representation because his allegations of ineffectiveness are based on facts not in the record before us. "For such cases, the General Assembly has provided a procedure whereby appellant can present evidence of his counsel's ineffectiveness. This procedure is through the post-conviction remedies of R.C. 2953.21." *State v. Cooperridder* (1983), 4 Ohio St. 3d 226, 228.

{¶ 144} On this record, the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Johnna M. Shia
Thomas J. Manning
Hon. Michael L. Tucker